## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

SELWYN KARP, Individually and On Behalf of All Others Similarly Situated,

                    Plaintiff,

vs.

SI FINANCIAL GROUP, INC., MARK D. ALLIOD, RHEO A. BROUILLARD, ROGER ENGLE, DONNA M. EVAN, MICHAEL R. GARVEY, ROBERT O. GILLARD, KEVIN M. MCCARTHY, KATHLEEN A. NEALON, DENNIS POLLACK, ROBERT C. CUSHMAN, SR., and BERKSHIRE HILLS BANCORP, INC.,

                    Defendants.

Civil Action No: 3:19-cv-00199

JURY TRIAL DEMANDED

## VERIFIED CONSOLIDATED AMENDED COMPLAINT

Plaintiff Selwyn Karp ("Plaintiff"), on behalf of himself, by his undersigned attorneys, for his consolidated amended complaint against Defendants (defined below), alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of himself and all other similarly situated public stockholders of SI Financial Group, Inc. ("SI FI" or the "Company") against Berkshire Hills Bancorp ("BHBI"), SI FI and the members of the Company's Board of Directors (referred to as the "Board" or the "Individual Defendants," and, together with BHBI, SI FI, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and

1

Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of SI FI by BHBI. Also, Plaintiff alleges that the Board breached its fiduciary duties to the Company's shareholders based on a conflict of interest, as the Board agreed to a lower offer in order to secure personal benefits for a number of its members, including, but not limited to, employment positions with BHBI in lieu of Company shareholders receiving a higher offer for their SI FI stock.

2.      On December 11, 2018, SI FI and BHBI entered into an Agreement and Plan of Merger (the "Merger Agreement").

3.      Pursuant to the Merger Agreement: (i) SI FI will merge with and into BHBI, with BHBI surviving the merger (the "Merger"), and (ii) the separate corporate existence of the Company shall cease (the "Transaction").

4.      On February 4, 2019, in order to convince SI FI's public common stockholders to vote in favor of the Transaction, BHBI filed a materially incomplete and misleading Form S-4 Registration Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      On February 26, 2019, this document was refiled with virtually identical content on Form DEFM 14A.

6.      SI FI is being acquired by BHBI in an all-stock transaction for 0.48 shares of BHBI for each share of SI FI common stock owned. At the time of the announcement, the deal was worth $15.00 to SI FI shareholders, which reflected a one-day premium of approximately 15%, which is low relative to the transactions analyzed by the Company's financial advisor, Keefe, Bruyette & Woods, Inc. ("KBW"). In KBW's analysis, the mean and median premiums were 30.2% and 24.0%, respectively.

7.     The merger closed on May 17, 2017.  Defendant BHBI is now the successor-in-interest to Defendant SI FI.  On that day, the deal was worth $14.83 per share to SI FI shareholders, a reduced 13.8% premium over the pre-announcement price.

8.     There are significant conflicts with acceptance by SI FI of the proposed offer. Specifically, the SI FI Board solicited BHBI to form an advisory board comprised of the current directors of SI FI, which BHBI agreed to do.  This was not agreed to by any of the competing bidders.  In fact, the Company received a significantly higher offer valued at $16.00 per share and a willingness to provide up to 30% of the merger consideration in the form of cash which would have limited potential losses to SI FI shareholders.  In violation of the Exchange Act, the Company failed to provide adequate information in the Proxy materials for rejecting the superior $16.00 offer as well as providing the necessary financial information as discussed herein.

**JURISDICTION AND VENUE**

9.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  The Court has supplemental jurisdiction over Plaintiff's breach of fiduciary duty state law claim pursuant to 28 U.S.C. § 1367 because the state law claim is so related to Plaintiff's other claims in this action that they form part of the same case or controversy.

10.     Personal jurisdiction exists over each Defendant either because each Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

78aa, as well as under 28 U.S.C. § 1391, because, among other things: (i) the conduct at issue had an effect in this District; (ii) each of the Individual Defendants (defined below) either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     ***Plaintiff Selwyn Karp*** is, and at all relevant times, has been an SI FI stockholder.

**Defendants**

13.     Defendant SI FI was a Maryland corporation with its principal executive offices located at 803 Main Street, Willimantic, Connecticut 06226.  SI FI was the parent holding company for Savings Institute Bank and Trust Company (the "Bank" or "Savings Institute").  The Bank operated as a community-oriented financial institution offering a full range of financial services to consumers and businesses in its market area, including life insurance and annuities.  SI FI common stock traded under the ticker symbol "SIFI".

14.     ***Defendant Mark D. Alliod*** ("Alliod") was, and had been at all relevant times, a director of the Company, and served as the Company's Chairman of the Board of Directors (the "Board").

15.     ***Defendant Rheo A. Brouillard*** ("Brouillard") was, and had been at all relevant times, a director of the Company, and served as the Company's President and Chief Executive Officer ("CEO").

16.     ***Defendant Roger Engle*** ("Engle") was, and had been at all relevant times, a

4

director of the Company.  Mr. Engle had been a SI FI director since 1998.

17. **Defendant Donna M. Evan** ("Evan") was, and had been at all relevant times, a director of the Company.

18. **Defendant Michael R. Garvey** ("Garvey") was, and had been at all relevant times, a director of the Company.

19. **Defendant Robert O. Gillard** ("Gillard") was, and has been at all relevant times, a director of the Company.

20. **Defendant Kevin M. McCarthy** ("McCarthy") was, and had been at all relevant times, a director of the Company.

21. **Defendant Kathleen A. Nealon** ("Nealon") was, and had been at all relevant times, a director of the Company.

22. **Defendant Dennis Pollack** ("Pollack") was, and had been at all relevant times, a director of the Company.

23. **Defendant Robert C. Cushman Sr.** ("Cushman") was, and had been at all relevant times, a director of the Company.

24. The parties in paragraphs 14 through 23 are collectively referred to herein as the "Individual Defendants," and together with the Company and BHBI, the "Defendants".

25. Defendant BHBI is a Delaware corporation with its principal executive offices located at 60 State Street, Boston, Massachusetts 01209.

**Non-Party SI FI Officers**

26. **Laurie L. Gervais** ("Gervais") was named Chief Operating Officer of SI FI in 2017 after having served as Executive Vice President and Chief Administrative Officer of Savings Institute Bank and Trust Company and SI Financial Group since 2015, Senior Vice President and

Director of Human Resources since 2009 and Vice President and Director of Human Resources since 2003.  Ms. Gervais served as Corporate Secretary for SI Financial Group.  Ms. Gervais joined Savings Institute Bank and Trust Company in 1983.

27.    ***Lauren L. Murphy*** ("Murphy") was named Executive Vice President of SI FI in 2017 after having served as Senior Vice President and Chief Financial Officer of Savings Institute Bank and Trust Company and SI FI Group since 2015, Senior Vice President and Principal Accounting Officer since 2013 and Vice President and Corporate Controller since 2007.

28.    ***Paul R. Little*** ("Little") was named Chief Credit Officer of SI FI in 2017 after having served as Senior Vice President and Chief Lending Officer since 2013 and Senior Vice President and Senior Commercial Loan Officer since he joined Savings Institute Bank and Trust Company in 2011. Prior to joining Savings Institute Bank and Trust Company, Mr. Little was Chief Lending Officer at Simsbury Bank and Trust.

29.    ***Jonathan S. Wood*** ("Wood") was named Executive Vice President and Director of Retail Banking of SI FI in 2015 after having served as Senior Vice President and Retail Banking Officer since he joined Savings Institute Bank and Trust Company in 2012. Prior to joining Savings Institute Bank and Trust Company, Mr. Wood was a Senior Vice President and Consumer Market Executive at Bank of America.

30.    ***Kenneth B. Martin*** ("Martin") was named Chief Lending Officer of SI FI in 2017 after having served as Senior Vice President and Marketing Executive since he joined Savings Institute Bank and Trust Company in May 2017.

## CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the other public stockholders of SI FI (the "Class").  Excluded from the Class are

Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

32.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of November 2, 2018, there were 12,033,611 shares of SI FI common stock held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of the Company will be ascertained through discovery;

(b)     there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following: (i) whether Defendants misrepresented or omitted material information concerning the Transaction in the Proxy, in violation of Section 14(a) of the Exchange Act; (ii) whether the Individual Defendants violated Section 20(a) of the Exchange Act; (iii) whether the Individual Defendants' breached their fiduciary duties to Plaintiff and other members of the Class; and (iv) whether Plaintiff and other members of the Class suffered irreparable harm in voting their shares regarding the Transaction based on the materially incomplete and misleading Proxy.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the

Class;

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)     a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**Background of the Company**

33.     SI FI was the parent holding company for Savings Institute.  Savings Institute operated 24 full-service offices throughout Windham, New London, Tolland, Hartford and Middlesex counties in Connecticut, and Newport and Washington counties in Rhode Island.

34.     Savings Institute operated as a community-oriented financial institution offering a full range of financial services to consumers and businesses in its market area, including life insurance and annuities.  Savings Institute attracted deposits from the general public and used those funds to originate one- to four-family residential, multi-family and commercial real estate mortgage loans, commercial business loans (including time share lending, loans to condominium associations and medical loans) and consumer loans.  Savings Institute also purchased commercial business loans, including loans fully guaranteed by the Small Business Administration and the United States Department of Agriculture.  Savings Institute sold certain fixed-rate one- to four-family residential conforming loans that it originated in the secondary market, primarily with the servicing retained.  Such sales generated mortgage banking fee income.  The remainder of Savings Institute's loan portfolio was originated for investment.

35.     On information and belief, Plaintiff alleges that from at least 2013 Defendants participated in a plan to pursue growth of the Company through mergers and acquisitions using a

structure that ensured substantial and disproportionate benefits to the Individual Defendants and certain executive officers of SI FI regardless of the benefits to its shareholders.   By way of example:

      (a)    <u>Director Retirement Agreement</u>

          (i)    At some time in 2010, Savings Institute separately entered into an Amended and Restated Director Retirement Agreement with Defendants Alliod, Engle, Evan, Garvey, and Gillard.

          (ii)    This agreement provides a "retirement benefit" of approximately 70% of each director's compensation for a period of 10 years following his or her retirement.

          (iii)    On or about December 18, 2013, the SI FI Board of Directors (which included most of the Individual Defendants) approved an amendment to its Director Retirement Agreement that added a "change in control" provision (*i.e.*, a merger such as the Transaction) equating such an event to a director's retirement. The amendments approved on or about December 18, 2013 define Change in Control and add a new benefit for the SI FI directors; namely that each will receive his or her retirement benefits in the event of a merger.  This new provision provides:

"Notwithstanding the foregoing, if a Director has a Separation from Service following a Change in Control (other than for Cause), the Director shall be entitled to the Annual Retirement Benefit set forth in this Section 3, regardless of the Director's age or Years of Service.  Said benefit shall

be payable in monthly installments beginning on the first day of the month following the Director's Separation from Service (for reasons other than Cause) and ending on the 120th month following commencement of such monthly payments."

(b)     Change in Control ("CIC") Agreements

    (i)     Upon information and belief, for undisclosed reasons, Defendants have elected to not have employment agreements with Gervais, Murphy, Little, and Wood and instead utilized Change in Control agreements along with other executive incentive and retirement plans.

    (ii)    The Change in Control agreements anticipated SI FI mergers and provide for otherwise unearned benefits to each of these executives as more fully discussed herein.

    (iii)   In its Proxy, Defendants represented that SI FI and the Bank are also a party to a CIC Agreement with Martin.

36.     On September 6, 2013, the Company acquired Newport Bancorp, Inc., the holding company for Newport Federal Savings Bank for 2,683,099 shares of Company common stock and $30.9 million in cash.  As a result of this transaction, the Company added six branches, $446.4 million in assets, $361.1 million in loans and $288.4 million in deposits to its franchise.

37.     On December 18, 2013, Savings Institute and Wood entered into a CIC Agreement. It provided that it is an amended and restated agreement replacing the parties' September 18, 2013 CIC Agreement.  SI FI is the guarantor of the CIC Agreement.  It provides for a lump sum cash payment equal to two (2) times the Executive's "base amount" and other generous continued

benefits coverage in the event of a change in control.

38.     On September 23, 2015, Savings Institute entered into separate CIC Agreements with Gervais, Murphy, and Little, as follows:

(a)     Regarding Gevais, her agreement provided that it was an amended and restated agreement replacing the parties' September 20, 2004 CIC Agreement and December 18, 2013 CIC Agreement with SI FI as guarantor.  This agreement provided for a lump sum cash payment equal to three (3) times the Executive's "base amount" and other generous continued benefits' coverage in the event of a change in control.  This agreement differs from Gervais's December 11, 2018 agreement and does not require her to exercise all of her vested Company stock options prior to January 1, 2019 and to dispose of all shares of Company common stock acquired pursuant to Section 1(a) of this Agreement upon exercise of incentive stock options prior to January 1, 2019;

(b)     Regarding Murphy, her agreement provided that it was an amended and restated agreement replacing the parties' September 21, 2011 CIC Agreement and December 18, 2013 CIC Agreement with SI FI as guarantor.  This agreement provided for a lump sum cash payment equal to three (3) times the Executive's "base amount" and other generous continued benefits' coverage in the event of a change in control. This agreement differs from Murphy's December 11, 2018 agreement and does not require her to exercise all of her vested Company stock options prior to January 1, 2019 and to dispose of all shares of Company common stock acquired pursuant to Section 1(a) of this Agreement upon exercise of incentive stock options prior to January 1, 2019; and

(c)      Regarding Little, his agreement provided that it was an amended and restated agreement replacing the parties' September 21, 2011 CIC Agreement and December 18, 2013 CIC Agreement with SI FI as guarantor. This agreement provided for a lump sum cash payment equal to three (3) times the Executive's "base amount" and other generous continued benefits' coverage in the event of a change in control.

39.      Also, on September 23, 2015, Brouillard and SI FI entered into an Amended and Restated Employment Agreement.  As stated therein, it was an amendment and restatement of the parties' earlier employment agreements entered on September 20, 2004, amended and restated in its entirety on December 17, 2008 for Section 409A compliance and December 13, 2013 to reflect the Company's second step conversion.

40.      On or about February 2016, Brouillard and SI FI entered into Amendment No. 1 to their September 23, 2015 Amended and Restated Employment Agreement.  This Amendment No. 1 made further changes to the parties' change in control provisions of their employment agreement. In addition to generous compensation, bonuses, and benefits, the Brouillard Agreement and Amendment No. 1 provides that in the event of a change in control, Brouillard will receive a lump-sum cash payment equal to 2.99 times the Executive's average Annual Compensation and other generous continued benefits' coverage.

41.      On October 24, 2018, the Company reported its financial results for the third quarter of 2018, including net income of $2.7 million, compared to net income of $2.2 million for the third quarter of 2017.  Diluted earnings per share ("EPS") were $0.23 in the third quarter of 2018, compared to $0.19 in the third quarter of 2017.  Defendant Brouillard commented on the successful quarter as follows:

12

The Bank continues to increase its focus on commercial lending, as evidenced by increases of $75.9 million in commercial loan originations and $2.4 million in interest income on loans during 2018 compared to the prior year. Similarly, deposits increased $42.0 million during the current year, which included nearly $23.0 million in non-interest-bearing deposits.

42.     That same day, the Board of the Company declared a cash dividend of $0.06 per share.

43.     More recently, on February 27, 2019, the Company reported its financial results for the fourth quarter of 2018, including net income of $1.5 million, compared to a net loss of $1.6 million for the fourth quarter of 2017. Diluted EPS were $0.13 in the fourth quarter of 2018, compared to $0.13 diluted loss per share in the fourth quarter of 2017. Defendant Brouillard commented on the successful quarter as follows:

Deposit and loan growth during 2018 continued to drive performance as core banking results once again improved year over year. These improvements reflect management's efforts in key areas such as growing low-cost demand deposits, reducing wholesale funding and expense control as evidenced by a slightly higher net interest margin and a lower efficiency ratio.

**Background of the Transaction**

44.     On April 27, 2016, the Board approved the engagement of KBW to provide financial advisory and investment banking services to the Company in connection with a possible business combination with another company. Thereafter, management of the Company, with KBW's assistance, selected seven (7) financial institutions to contact with respect to a possible business combination with the Company, from the twelve (12) parties KBW had previously reviewed with the Board.

45.     In June 2016, KBW contacted the seven financial institutions. Of the seven, six signed non-disclosure agreements, of which four requested and received a confidential information memorandum regarding the Company. All four of the financial institutions that received the

confidential information memorandum elected not to proceed with a business combination with the Company.  BHBI indicated that it needed time to integrate its recently announced acquisition of First Choice Bank but would be interested in discussing a transaction at a later date.

46.     On August 2, 2016, Defendant Brouillard encountered the CEO of one of the financial institutions that had been contacted by KBW (referred to in the Proxy as "Company A") at an industry event, where they agreed to meet subsequently to discuss a possible business combination between SI FI and Company A.

47.     On December 1, 2016, Company A submitted a non-binding indication of interest with respect to the acquisition of the Company in a 100% stock transaction with a fixed exchange ratio.

48.     On December 8, 2016, the Board approved the negotiation of a definitive agreement with Company A on the terms reflected in Company A's indication of interest letter.  On December 14, 2016, SI FI and Company A entered into a letter agreement pursuant to which SI FI agreed to negotiate exclusively with Company A until January 31, 2017.  In late January 2017, discussions slowed pending resolution of certain due diligence matters.

49.     In late April 2017, Company A communicated that it would not be able to proceed with a transaction.

50.     In early January 2018, the CEO of a financial institution referred to in the Proxy as "Company C" contacted Defendant Brouillard about meeting to discuss a possible business combination.

51.     On January 10, 2018, Defendant Brouillard met with the CEO of Company C, who provided a non-binding indication of interest letter with respect to a business combination with SI FI for a 100% stock transaction in which shares of SI FI common stock would be converted into

shares of Company C common stock with a value of $14.05.

52.    On April 24, 2018, Company C verbally communicated to SI FI that Company C would increase the value of the merger consideration to $14.40.  Thereafter, the SI FI Board concluded that the indicated value of the transaction with Company C was insufficient and discontinued discussions with Company C.

53.    On October 19, 2018, Michael Daly ("Daly"), the former President and CEO of BHBI, contacted Defendant Brouillard to express interest in a possible combination between BHBI and SI FI.  That same day, the CEO of another financial institution referred to in the Proxy Statement as "Company D" contacted Defendant Brouillard to express interest in a possible combination between Company D and SI FI.

54.    On October 23, 2018, BHBI delivered a draft indication of interest letter that proposed the acquisition of SI FI by BHBI in a 100% stock transaction with a fixed exchange ratio of between 0.43 and 0.45 shares of BHBI common stock for each share of SI FI common stock.

55.    On October 31, 2018, representatives of Company D met with Defendant Brouillard to discuss a potential business combination between their respective companies. Defendant Brouillard informed them that the SI FI Board planned to meet on November 2, 2018, to discuss an indication of interest from another company and that Company D would need to provide an indication of interest before that date in order to be considered as a possible partner for a business combination.

56.    On that same day, representatives of SI FI and BHBI finalized the form of exclusivity agreement and BHBI provided an updated draft of its indication of interest letter, which continued to reflect an exchange ratio of 0.43 to 0.45 shares of BHBI common stock for each share of SI FI common stock.

57.   On the afternoon of November 1, 2018, Company D delivered an indication of interest letter that proposed a 100% stock transaction valued at $15.50 per share, with a fixed exchange ratio established at the time of signing a definitive merger agreement.  Company D's indication of interest letter indicated that Company D would select and appoint two members of the SI FI Board to the board of directors of Company D's bank subsidiary.  Company D's indication of interest letter did not provide that any of SI FI's executive officers would join Company D's executive management team.

58.   That same evening on November 1, 2018, Mr. Daly, the former President and CEO of BHBI, and Defendant Brouillard, together with the parties' respective financial advisors, discussed BHBI's indication of interest letter. Later that evening, BHBI delivered a revised indication of interest letter that proposed a 100% stock transaction with a fixed exchange ratio of 0.46 shares of BHBI common stock, which had an indicated value of $15.51 based on the closing price of BHBI common stock on November 1, 2018.  BHBI's revised indication of interest letter indicated that BHBI would offer one seat on its board of directors to a current director of SI FI. BHBI's revised indication of interest letter did not provide that any of SI FI's executive officers would join BHBI's executive management team.

59.   On November 2, 2018, the SI FI Board met to discuss the non-binding indication of interest letters from BHBI and Company D.  KBW reviewed and compared the terms of the transactions proposed by BHBI and Company D, provided an overview of BHBI and Company D and their respective financial performance, reviewed the market performance of SI FI, BHBI and Company D and reviewed financial aspects of each of the proposed transactions.  After considering the risks and benefits of each of the proposed transactions, including the proposed consideration to be received by holders of SI FI common stock, the perceived prospects for each of BHBI and

Company D, and the perceived impact of each transaction on the employees of and communities served by SI FI, as well as that both BHBI and Company D required SI FI to agree to negotiate exclusively with them, the SI FI Board authorized management to negotiate a definitive agreement with BHBI on the terms set forth in BHBI's indication of interest letter and to enter into non-disclosure and exclusivity agreements with BHBI.  ***Because BHBI does not currently have branches located in the markets served by SI FI, the SI FI Board instructed management to request that BHBI agree to form an advisory board comprised of the current directors of SI FI***.

60.     Later that same day, on November 2, 2018, SI FI and BHBI executed a mutual non-disclosure agreement and an exclusivity agreement.  The mutual non-disclosure agreement contains a customary standstill provision that obligates BHBI to refrain for a period of 12 months from pursuing various actions that relate to acquisition of control of SI FI, such as making proposals to acquire SI FI, buying shares of SI FI common stock, and commencing a proxy contest. The non-disclosure agreement also contains a provision stating that BHBI is not permitted to publicly request a waiver or termination of the standstill provision.  The exclusivity agreement required SI FI to negotiate exclusively with BHBI for a period of 30 days.

61.     On December 1, 2018, SI FI and BHBI extended their exclusivity agreement to December 16, 2018.

62.     ***On December 5, 2018, Company D delivered to SI FI an unsolicited non-binding indication of interest letter that proposed a 100% stock transaction valued at $16.00 per share, with a fixed exchange ratio established at the time of signing a definitive merger agreement. Company D expressed a willingness to provide up to 30% of the merger consideration in the form of cash should SI FI prefer***.  Consistent with its original indication of interest letter, Company D's updated indication of interest letter stated that Company D would select and appoint

two members of the SI FI Board to the board of directors of Company D's bank subsidiary and did not provide that any of SI FI's executive officers would join Company D's executive management team.  Company D's updated indication of interest letter stated that consummation of a transaction would be subject to completion of due diligence in a manner satisfactory to Company D and required that SI FI agree to negotiate exclusively with Company D.  At SI FI's direction, representatives of KBW communicated the financial terms of Company D's indication of interest (without identifying Company D) to representatives of Piper Jaffray, the financial advisor to BHBI.

63.    On December 6, 2018, BHBI verbally communicated that it would increase the exchange ratio in the merger to 0.48 shares of BHBI common stock for each share of SI FI common stock, which had an indicated value of $15.48, based on the closing price of BHBI common stock on that date.  BHBI also communicated that it had completed its due diligence and was ready to approve and execute the merger agreement and that the exchange ratio of 0.48 was the most that BHBI would offer.  BHBI indicated its intention to pursue other strategic alternatives should SI FI allow the exclusivity period with BHBI to lapse and thereafter commence discussions with Company D.

64.    As stated in the Proxy, Company D's offer proposed a 100% stock transaction valued at $16.00 per share, with a fixed exchange ratio established at the time of signing a definitive merger agreement, and in the alternative, 30% of the merger consideration paid by Company D could be in the form of cash to lessen the exchange ratio risk.  BHBI's offer is based on a stated fixed exchange ratio of 0.48; Plaintiff and all other shareholders did not know and could not determine what price per share they would receive at the completion of the merger.  In order for Plaintiff and all other shareholders to receive $16.00 per share at the conclusion of this merger, BHBI's closing share price on that date must meet or exceed $33.35.  Since the announcement of

this merger (on December 11, 2018), BHBI stock has never closed at or above that price.

65.     On December 7, 2018, the Board met and approved continuing to finalize the transaction with BHBI under the terms of its revised proposal.

66.     On December 11, 2018, the Board met, KBW delivered its fairness opinion and the Board determined to approve and adopt the Merger Agreement and the transactions contemplated by it.

67.     On December 11, 2018, BHBI and SI FI executed the Merger Agreement.

**SUBSTANTIVE ALLEGATIONS**

**The Transaction**

68.     On December 11, 2018, SI FI and BHBI issued a joint press release announcing the Transaction.  The press release stated in relevant part:

**Berkshire Hills to Acquire SI Financial Group**
**Contiguous Market Transaction that Bolsters Deposit Profile**

BOSTON, MA and WILLIMANTIC, CT, December 11, 2018, Berkshire Hills Bancorp, Inc. (NYSE: BHLB) ("Berkshire") and SI Financial Group, Inc. (NASDAQ: SIFI) ("SIFI") announced today that they have signed a definitive merger agreement under which Berkshire will acquire SIFI and its subsidiary, Savings Institute Bank and Trust Company ("Savings Institute"), in an all-stock transaction valued at $180 million based on Berkshire's stock price as of the close of business on December 10, 2018.

Berkshire's total assets will increase to $13.6 billion including the $1.6 billion in acquired SIFI assets. SIFI reported $1.3 billion in loans and $1.3 billion in deposits as of September 30, 2018. This merger agreement increases Berkshire's market presence with 18 branches in Eastern CT and 5 branches in Rhode Island, adding to Berkshire's existing 9 Connecticut branches.

"We're pleased to welcome Savings Institute's customers and employees to the Berkshire family," said Richard M. Marotta, Chief Executive Officer of Berkshire. "This transaction is a natural fit and brings with it a stable, longstanding deposit base with leading market position. The Savings Institute franchise strengthens our Northeast presence, as we gain scale in Connecticut and enter into attractive Rhode Island markets. Savings Institute is a well-established and trusted financial institution with deep client and community relationships. We look forward to

expanding those relationships with the depth and breadth of our products and services. This partnership will produce attractive returns for both our existing shareholders and the new shareholders from SIFI joining us in this transaction."

"We're excited to be joining with a successful regional bank that shares our commitment to community and customer service," commented Rheo A. Brouillard, President and Chief Executive Officer of SIFI. "Like Savings Institute, Berkshire Bank was established in the mid to late 1800s and has grown over the years as a result of that commitment. The combination of our two banks will provide greater convenience and a broader array of products to our customers who will continue to have the personalized service they have come to expect."

## TRANSACTION SUMMARY

Under the terms of the merger agreement, each outstanding share of SIFI common stock will be exchanged for 0.48 shares of Berkshire Hills common stock. Upon closing, any outstanding SIFI options will be vested and converted into Berkshire options.

Following are selected transaction terms and metrics based upon current projections:

- Total transaction value: $180 million
- Price to September 30, 2018 tangible book value: 118%
- Tangible book value dilution of $0.53 per share or 2.4% with an expected less than 3.0 year earn-back period
- Anticipated to be 5% accretive to earnings per share in 2020, the first full year of integrated operations
- Core deposit premium: 2.6%
- Targeted cost saves: 30%

## LEADERSHIP

Under the agreement, SIFI's President and Chief Executive Officer, Rheo A. Brouillard, will be appointed to Berkshire's Board of Directors when the merger is completed. Key business leaders from SIFI will remain with Berkshire Bank in continuing leadership roles.

## APPROVALS

The transaction is intended to qualify as a tax-free reorganization for federal income tax purposes, and as a result, the shares of SIFI stock exchanged for shares of Berkshire stock are expected to be transferred on a tax-free basis. The definitive agreement has been approved by the unanimous votes of the Boards of Directors of both companies. Consummation of the agreement is subject to the approval of SIFI's shareholders, as well as state and federal regulatory agencies. The merger is

targeted to be completed in the second quarter of 2019.

69.     The Merger Consideration is unfair because, among other things, the intrinsic value of the Company was in excess of the amount the Company's stockholders will hold in the combined business entity.

**The Company Insiders' Interests in the Transaction**

70.     The Company's insiders are the primary beneficiaries of the Transaction, not the Company's shareholders.  The Company's Board and its executive officers are conflicted because they will have secured unique benefits for themselves from the Transaction not available to Plaintiff and the Company's shareholders.

71.     Certain Company insiders have secured positions for themselves with the combined company.  For example, Defendant Brouillard will join the board of directors of BHBI and Berkshire Bank upon completion of the Transaction.  In addition, Berkshire Bank will create an advisory board and will invite each of the Individual Defendants, other than Defendant Brouillard, to join the advisory board.

72.     On December 11, 2018, BHBI, Berkshire Bank, SI FI, Savings Institute Bank and Trust Company, and Laurie L. Gervais entered into an agreement (the "Gervais Agreement") by which (a) Gervais agreed to exercise all of her vested Company stock options prior to January 1, 2019, and SI FI agrees to take all actions necessary to facilitate the exercise of Gervais's Company stock options, including, if requested by Gervais, amending her option award agreements to permit a net settlement to satisfy the exercise price and applicable tax withholding; (b) Gervais agreed to dispose of all shares of Company common stock acquired pursuant to Section 1(a) of the Gervais Agreement upon exercise of incentive stock options (such disposition to occur prior to January 1, 2019); and (c) Gervais agreed that the compensation income resulting

from the exercise of vested stock options and the disposition of shares of Company common stock acquired upon such exercise pursuant to the agreement would be excluded from the calculation of severance or other benefits payable to Gervais, including Gervais's cash severance payment under the CIC Agreement, the allocation of shares under the Company Employee Stock Ownership Plan and Trust ("ESOP"), and benefits payable under the Supplemental Executive Retirement Plan between SI FI and Gervais.

73.     The Gervais Agreement also provided that for the period beginning on the day following the termination date of Gervais from SI FI and continuing for a period of six (6) months, Gervais would provide the following consulting services to BHBI: (a) Gervais would provide services and advice regarding the integration and transition planning and implementation related to the merger; and (b) Gervais would provide such other services as may be reasonably requested by BHBI from time to time.

74.     In consideration for Gervais's consulting services as described above, the Gervais Agreement provided that Berkshire Bank would pay Gervais a consulting fee of $5,450.00 monthly in exchange for her availability for up to thirty-two (32) hours per month.  In addition to that payment amount, under her agreement, for one year after the closing of the merger, Gervais shall be subject to non-competition and non-solicitation restrictions with respect to the business and the employees of Berkshire Bank or any of their respective subsidiaries or affiliates. During this period, Berkshire Bank will pay Gervais $8,333.33 per month for a total of $100,000 over twelve months.

75.     On December 11, 2018, BHBI, Berkshire Bank, SI FI, Savings Institute Bank and Trust Company, and Murphy entered into an agreement (the "Murphy Agreement").  The Murphy Agreement provided that:

(a)      Murphy agreed to exercise all of her vested Company stock options prior to January 1, 2019, and SI FI agreed to take all actions necessary to facilitate the exercise of the Executive's Company stock options, including, if requested by Murphy, amending her option award agreements to permit a net settlement to satisfy the exercise price and applicable tax withholding;

(b)      Murphy agreed to dispose of all shares of Company common stock acquired pursuant Section 1(a) of the Murphy Agreement upon exercise of incentive stock options, such disposition to occur prior to January 1, 2019;

(c)      Murphy agreed that the compensation income resulting from the exercise of vested stock options and the disposition of shares of Company common stock acquired upon such exercise pursuant to the Murphy Agreement, Section 1, would be excluded from the calculation of severance or other benefits payable to her, including her cash severance payment under the CIC Agreement, the allocation of shares under the Company ESOP, and benefits payable under the Supplemental Executive Retirement Plan between SI FI and Murphy; and

(d)      prior to December 31, 2018, SI FI would make a lump-sum cash payment to Murphy in the amount of $280,000, less applicable taxes and withholding.  The Murphy Agreement also included a provision that Murphy "…acknowledges that this payment is in partial satisfaction of the cash severance payment that would otherwise be payable under the CIC Agreement…" The Murphy Agreement further provided that the remainder of the severance payment due under the CIC Agreement would be paid subject to the terms and conditions of the CIC Agreement, and that  Murphy agrees that this payment will be excluded from the

calculation of severance or other benefits payable to her, including her cash severance payment under the CIC Agreement, the allocation of shares under the Company ESOP, and benefits payable under the Supplemental Executive Retirement Plan between Savings Institute Bank and Trust Company and Murphy; and SI FI and Savings Institute Bank and Trust Company, and their successors and assigns, agreed to defend, indemnify and hold Murphy harmless for any additional taxes, penalties and interest assessed against her pursuant to Section 409A of the IRC and the regulations promulgated thereunder ("Section 409A") with regard to the payment to be made under Section 1(d) of the Murphy Agreement.  BHBI agreed to pay Murphy an additional payment for any such additional taxes, penalties and interest that may be assessed under Section 409A, such that, after payment by Murphy of the additional taxes, penalties and interest assessed under Section 409A, Murphy would be in the same economic position that she would have occupied had such payment not been determined to be noncompliant with Section 409A.

76.     Defendant Brouillard entered into an agreement with SI FI and BHBI following completion of the Transaction.

77.     More specifically, as of December 11, 2018, BHBI, Berkshire Bank, SI FI, Savings Institute Bank and Trust Company, and Brouillard entered into an agreement (the "Brouillard Agreement") by which (a) Brouillard agreed to exercise all of his vested Company stock options prior to January 1, 2019, and SI FI agreed to take all actions necessary to facilitate the exercise of his Company stock options, including, if requested by Brouillard, amending his option award agreements to permit a net settlement to satisfy the exercise price and applicable

tax withholding; (b) Brouillard agreed to dispose of all shares of Company common stock acquired pursuant to Section 1(a) of the Brouillard Agreement upon exercise of incentive stock options, such disposition to occur prior to January 1, 2019; and (c) Brouillard agreed that the compensation income resulting from the exercise of vested stock options and the disposition of shares of Company common stock acquired upon such exercise pursuant to Brouillard Agreement, Section 1, would be excluded from the calculation of severance or other benefits payable to Brouillard, including his cash severance payment under the Employment Agreement, the allocation of shares under the Company ESOP, and benefits payable under the Supplemental Executive Retirement Plan between SI FI and Brouillard.

78.    Furthermore, according to the December 11, 2018 press release announcing the Transaction, "[k]ey business leaders from [SI FI] [were to] remain with Berkshire Bank in continuing leadership roles."

79.    The Company's named executive officers received substantial cash severance payments in connection with the Transaction, as set forth in the following table:

| Named Executive Officers | Cash[1] ($) | Equity[2] ($) | Pension/ NQDC[3] ($) | Perquisites/ Benefits[4] ($) | Total ($) |
|---|---|---|---|---|---|
| Rheo A. Brouillard | 1,980,045 | — | 193,314 | 61,883 | 2,235,242 |
| Laurie L. Gervais | 987,535 | — | 136,758 | 26,650 | 1,150,943 |
| Paul R. Little | 808,765 | 5,560 | — | 62,398 | 876,723 |
| Lauren L. Murphy | 400,702 | — | 1,047,283 | 62,398 | 1,510,383 |
| Jonathan S. Wood | 498,622 | — | — | 31,717 | 530,339 |

80.    In addition, following the completion of the merger, Berkshire Bank will establish an advisory board and will invite those individuals who serve on the SI FI Board as of the date of the merger agreement, other than Brouillard, to join the advisory board.  The claimed function of the advisory board will be, among other things, to provide support and continuity to the combined

company.  It is anticipated that the advisory board will meet as requested by the board of directors

of Berkshire Bank from and after the effective time of the merger for a term of one year, and each

member of the advisory board will be paid an annual retainer fee of $10,000.

81.     The merger agreement provided that, for six years after the effective time of the

merger, BHBI will maintain SI FI's existing directors' and officers' liability insurance policy or

a comparable policy. BHBI and the surviving corporation will indemnify, defend and hold

harmless each current and former director, officer or employee of SI FI or its subsidiaries against

any costs or expenses (including reasonable attorney's fees), judgments, fines, losses, claims,

damages or liabilities and amounts paid in settlement in connection with any actual or threatened

claim, action, suit proceeding or investigation, whether civil, criminal, administrative or

investigative, arising out of or pertaining to (a) the fact that such person is or was a director,

officer or employee of SI FI or any of its subsidiaries, or was serving at SI FI's request as a

director, officer, employee or in certain other capacities on behalf of another corporation, limited

liability company, partnership, joint venture, trust or other enterprise, or (b) matters in connection

with the transactions contemplated by the merger agreement (in each case arising out of matters

existing or occurring at or prior to the effective time of the merger, whether asserted or claimed

prior to, at or after the effective time of the merger, to the fullest extent such person would have

been indemnified pursuant to SI FI's articles of incorporation and bylaws and as permitted by

applicable law).  BHBI or the surviving corporation will also advance expenses as incurred to

the fullest extent permitted under applicable law.

## THE MATERIALLY INCOMPLETE AND MISLEADING PROXY

82.     On February 4, 2019, Defendants filed an incomplete and misleading Proxy with

the SEC and disseminated it to the Company's shareholders.  The Proxy solicited the Company's

shareholders to vote in favor of the Transaction.  On February 26, 2019, this document was refiled with virtually identical content on Form DEFM 14A.

83.     Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.

84.     The Proxy disclosed that on December 5, 2018 the Company received an indication of interest letter from Company D to acquire SI FI in a stock transaction valued at $16.00 per share, and that Company D expressed a willingness to provide up to 30% of the merger consideration in the form of cash which would reduce the risk for SI FI shareholders should the acquiror's share price decline.

85.     Regarding Company D, although on November 2, 2018 KBW provided certain information to the Individual Defendants, the Proxy failed to disclose or provide to the Company shareholders:

      (a)     An overview of Company D;

      (b)     Company D's financial performance;

      (c)     The combined Company's (D and SI FI) financial projections, if any;

      (d)     Company D's market/business locations;

      (e)     Detailed financial aspects of Company D's proposed transaction; and

      (f)     An explanation that the potential downside risk of the merger is lessened if 30% of the purchase price is paid in cash rather than in stock of the acquiring company.

86.     The disclosures and rationales of Defendants set forth in the Proxy for selecting the inferior BHBI merger offer over the Company D merger offer was materially insufficient and

negatively impacted Plaintiff's ability, and that of the Class, to make an informed voting decision.

87.     Additionally, in its Proxy under "Interests of SI Financial's Directors and Executive Officers in the Merger that are Different From Yours", Defendants provided some information and a chart regarding certain named executive officers anticipated substantial cash severance payments in connection with the Transaction (*see* above).  However, the Proxy created confusion and was incomplete and materially misleading regarding the Gervais Agreement and Murphy Agreement and the terms in each relating to the requirement to exercise all of their vested Company stock options prior to January 1, 2019 and to dispose of all shares of Company common stock acquired pursuant to Section 1(a) of their Agreements upon exercise of incentive stock options prior to January 1, 2019.

**KBW's *Discounted Cash Flow* Analyses**

88.     As part of its Fairness Opinion and analysis, KBW performed *discounted cash flow* ("DCF") analyses for both SI FI and BHBI.  For SIFI, KBW applied a discount rate range of 12-15% and arrived at a range of values of $12.13 - $16.29 per share.  However, in the Proxy, KBW and Defendants failed to provide information regarding how it determined and/or set this discount rate range and whether it reflects SI FI's weighted average cost of capital ("WACC").

89.     For BHBI, KBW applied a discount rate range of 10-13% and arrived at a range of values of $32.22 - $45.80 per share.  However, KBW and Defendants did not provide information in the Proxy regarding how it determined and/or set this discount rate range and whether it reflects BHBI's WACC.

90.     These key inputs are material to SI FI shareholders, and their omission from the Proxy renders the summary of KBW's *Discounted Cash Flow Analysis* incomplete and misleading. Defendants' failure to provide information regarding how they determined and/or set this discount

rate range and whether it reflects each company's WACC in the Proxy, made that portion of the Proxy materially misleading.

91.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statement made, in light of the circumstances under which they are made, not misleading . . . ."  15 U.S.C. § 78n(e).  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices, "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ."  *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…* This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78 (emphasis added).

92.     Without the above-mentioned information, SI FI shareholders could not evaluate for themselves the reliability of KBW's *Discounted Cash Flow Analysis*, make a meaningful determination of whether the illustrative present value per share reference ranges reflect the true

value of the Company or was the result of KBW's unreasonable judgment, or make an informed decision regarding whether to vote for the merger.

93.     In addition, KBW provided **no projections** for free cash flow ("FCF") in performing its DCF analysis for both companies.  In the Proxy, the only projections for SI FI include projected earnings per share for 2019 and 2020 of $0.99 and $1.07, respectively, and an assumed growth rate of 8% per year for 2021 and beyond.   For BHBI, the Proxy included "Street" estimates of $2.91 and $3.10 for 2019 and 2020, respectively, and an assumed growth rate of 6% per year thereafter.

94.     Defendants' failure to include FCF projections in its Proxy made that section of the Proxy materially misleading.   Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected Net Income.  *See* Cornelius J. Casey and Norman J. Bartczak, *Cash Flow—It's Not the Bottom Line*, Harvard Bus. Rev. (1984) ("A growing number of securities analysts, financial writers, and accounting policymakers contend that financial statements providing information of a company's cash flows yield a better measure of operating performance than do the company's income statement and balance sheet.   According to recent surveys, corporate and government officials have accepted this view; they rated **cash flow data the most important piece of information contained in published financial statements**. The trend toward wider acceptance of this yardstick has been building since the early 1970s. Accelerating the trend have been several developments … that put greater distance between a company's net income and its cash flow.") (emphasis added).

95.     There are fundamental differences between free cash flows and net income.  A company's net income is a quite arbitrary figure obtained after assuming certain accounting

hypotheses regarding expenses and revenues.  On the other hand, free cash flow is an objective measure, a single figure that is not subject to any personal criterion.  *See* Pablo Fernández, *Cash flow is a Fact. Net income is just an opinion*, (October 17, 2008), http://csinvesting.org/wp-content/uploads/2015/02/Cash-Flow-vs.-NI.pdf, also found as *Valuation Methods and Shareholder Value Creation*, Chapter 9 Cash Flow and Net Income, 2002 Academic Press, San Diego, CA.

96.    As a leading financial expert explains:

The classic definition of net income (revenues for a period less the expenses that enabled these revenues to be obtained during that period), in spite of its conceptual simplicity, is based on a series of premises that seek to identify which expenses were necessary to obtain these revenues.  This is not always a simple task and often implies accepting a number of assumptions. Issues such as the scheduling of expense accruals, the treatment of depreciation, calculating the product's cost, allowances for bad debts, etc., seek to identify in the best possible manner the quantity of resources that it was necessary to sacrifice in order to obtain the revenues.   Although this "indicator", once we have accepted the premises used, can give us adequate information about how a company is doing, the figure obtained for the net income is often used without full knowledge of these hypotheses, which often leads to confusion.

97.    "Free cash flow is accurate because it shows the cash coming in and the cash going out whereas with net income, one has to worry about accrual accounting, non-cash charges such as depreciation and most importantly, heavy manipulation.  The main advantage that free cash flow has over earnings is that it can't be manipulated as much."  David Thomas, *Why Free Cash Flow Is Better Than Earnings, Shares and Stock markets*, (July 29, 2013), https://sharesandstockmarkets.com/free-cash-flow-v-earnings/.  Simply stated, net income is an accounting number used for reporting purposes, but free cash flow is the actual amount of cash available to investors and is therefore a material financial metric to them.

98.    Further aggravating Defendants' failure to disclose the Company's Free Cash Flow is that the projections of the Proxy only disclosed financial projections for the fiscal years 2019

and 2020.  In other words, SI FI shareholders were provided with projections that covered less than half the amount of time that KBW had access to and utilized when preparing its DCF analysis in support of its fairness opinion.  As a result, SI FI shareholders could not even compare Net Income, or any of the other projections metrics, to the SI FI's Free Cash Flows for the full time period.

99.     The SI FI Free Cash Flow information was plainly material information which Defendants were negligent in omitting from the Proxy, especially since they were readily available, utilized by the financial advisor to value the Company, and were the key input in its most important valuation methodology.

100.     In addition, Defendants' also failed to include in the Proxy any identification or information relating to the metrics required to estimate excess cash flows during the forecast period which were used and relied on by KBW in its DCF analyses.  Defendants' failure to include any identification or information relating to the metrics required to estimate excess cash flows during the forecast period, particularly those projections relied upon by its financial advisor KBW, made this section of the Proxy materially misleading.

**KBW's Selected Companies Analysis**

101.     The Proxy described KBW's fairness opinion and the various valuation analyses performed in support of its opinion.  However, KBW's fairness opinion and analyses failed to include key inputs and assumptions underlying these analyses.  Without this information, SI FI's shareholders were unable to fully understand these analyses and, thus, were unable to determine what weight, if any, to place on KBW's fairness opinion in determining whether to vote in favor of the Transaction.  This omitted information, if disclosed, would have significantly altered the total mix of information available to SI FI's shareholders.

102.    With respect to KBW's *Berkshire Hills Bancorp Selected Companies Analysis* and *SI Financial Selected Companies Analysis*, the Proxy failed to disclose: (a) the individual multiples and financial metrics for each of the selected companies analyzed by KBW; and (b) any benchmarking analyses for SI FI in relation to the companies analyzed by KBW.

**KBW's Selected Transaction Analysis**

103.    With respect to KBW's *Selected Transactions Analysis*, the Proxy failed to disclose: (a) the individual multiples and financial metrics for each of the selected transactions analyzed by KBW; and (b) any benchmarking analyses for SI FI in relation to the target companies analyzed by KBW.

**KBW's Relative Contribution Analysis**

104.    With respect to KBW's *Relative Contribution Analysis*, the Proxy failed to disclose the 2018-2020 GAAP Net Income figures for both SI FI and BHBI used in the analysis.

**KBW's Forecasted Pro Forma Impact Analysis**

105.    With respect to KBW's *Forecasted Pro Forma Financial Impact Analysis*, the Proxy failed to disclose: (a) the closing balance sheet estimates as of June 30, 2019 for BHBI and SI FI, extrapolated from historical data using growth rates for SI FI and BHBI provided by BHBI management; (b) the *pro forma* assumptions provided by BHBI, including, among other things, the cost savings and related expenses expected to result from the merger and certain accounting adjustments and restructuring charges assumed with respect thereto and financial forecasts and projections relating to the net income of SI FI; and (c) the specific EPS and tangible book value per share accretion and dilution figures resulting from the analysis as well as the specific estimates of *pro forma* BHBI's tangible common equity to tangible assets ratio, Tier 1 Leverage Ratio, Common Equity Tier 1 Ratio, Tier 1 Risk-Based Capital Ratio and Total Risk Based Capital Ratio

as of June 30, 2019.

106.     In sum, the omission of the above-referenced information rendered each respective section in the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Because this information was absent from the Proxy at the time of the stockholder vote, Plaintiff and the other members of the Class were unable to make an informed decision regarding whether to vote their shares in favor of the Transaction.

**Material Omissions Concerning Potential Conflicts of Interest of Company Insiders**

107.     The Proxy failed to disclose material information concerning potential conflicts of interest faced by Company insiders.

108.     As set forth above, certain Company insiders have secured positions for themselves with the combined company.  For example, Defendant Brouillard will join the board of directors of Berkshire and Berkshire Bank upon completion of the Transaction.  Additionally, Berkshire Bank will create an advisory board and will invite each of the Individual Defendants, other than defendant Brouillard, to join the advisory board.  Moreover, Gervais has entered into an agreement with SI FI and BHBI pursuant to which she will provide consulting services to Berkshire following completion of the Transaction and an additional payment as consideration for certain restrictive covenants.  Furthermore, according to the December 11, 2018 press release announcing the Transaction, "[k]ey business leaders from SI FI will remain with Berkshire Bank in continuing leadership roles."

109.     However, the Proxy failed to disclose the details of all employment related discussions and negotiations that occurred between the Company and BHBI executive officers and directors, including who participated in such communications, when they occurred and their content. The Proxy further failed to disclose whether any of BHBI's prior proposals or indications

of interest mentioned management retention in the combined company.

110.    Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information was necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

111.    The omission of this information rendered the statements in the "Background of the Merger" and "Interests of SI Financial's Directors and Executive Officers in the Merger that are Different From Yours" sections of the Proxy Statement materially misleading in contravention of the Exchange Act.

**DEMAND REFUSED**

112.    On February 8, 2019, shareholder Karp filed a complaint which contained therein demands that the Board of SI FI provide further material information regarding the proposed merger transaction with BHBI by way of issuing a public supplement to the S-4 disclosing the additional material information to the shareholders of SI FI.

113.    On February 8, 2019, shareholder Karp also made a further demand upon the Board by letter to provide further material information regarding the Transaction with BHBI.

114.    The Board of SI FI refused to act upon this demand.

115.    This refusal by the Board of SI FI to act upon the aforesaid demand was wrongful and a breach of their fiduciary duties.

116.    Thereafter, several other shareholders also filed suit making demands upon the Board to provide supplemental material information about the Transaction.

117.    Upon information and belief, other shareholders also made demand by letter upon

the Board to disclose further material information about the Transaction.

118.    The Board also refused to act upon these additional demands.  Said refusal to act

by the Board of SI FI was wrongful and constituted a breach of their fiduciary duties.

119.    Accordingly, Plaintiff hereby asserts claims derivatively against the Board for

their wrongful refusal to comply with the aforesaid demands.

## COUNT I

### (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9 PROMULGATED THEREUNDER

120.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

121.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use

of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to

section 78l of this title." 15 U.S.C. § 78n(a)(1).

122.    "[W]here the plaintiffs represent the very class who were asked to approve a merger

on the basis of a misleading proxy statement and are seeking compensation from the beneficiary

who is responsible for the preparation of the statement, they are not required to establish any evil

motive or even reckless disregard of the facts."  *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281,

1300-01 (2d Cir. 1973).

123.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that communications with stockholders in a recommendation statement shall not

contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

124.    Defendants issued the Proxy with the intention of soliciting stockholders' support for the Transaction.  Each Defendant reviewed and authorized the dissemination of the Proxy, which failed to provide critical information detailed above.

125.    In so doing, Defendants omitted material facts necessary to make the statements made not misleading.  Each Defendant, by virtue of their roles as officers and/or directors, were aware of the omitted material information but failed to disclose such information, in violation of Section 14(a).  Defendants therefore had reasonable grounds to believe material facts existed that were omitted from the Proxy, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

126.    The Proxy was materially misleading and omitted material facts that were necessary to render it not misleading. Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

127.    Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

128.    Defendants violated securities laws in preparing and reviewing the Proxy. The

preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact violates securities laws.  Defendants chose to omit material information from the Proxy or failed to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.

129.    The omissions in the Proxy are material to Plaintiff and the Company's other shareholders, each of whom were deprived of their right to cast an informed vote because such omissions were not corrected prior to the vote on the Transaction.

130.    When corporate actors voluntarily elect to speak regarding projections and valuation-related information, they assume an obligation to do so in a complete and accurate manner.  When it comes to disclosing projections and valuation information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose incomplete half-truths.

131.    Indeed, with respect to cash flow projections, which have been repeatedly recognized as material to shareholders faced with deciding whether to approve a merger or assess the value of their shares, there is a duty to speak fully and truthfully, and provide complete and non-misleading information.  In sum, if one speaks on a topic, he is bound not only to state the truth, but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure.

132.    Consequently, the selective disclosure of projections and valuation information is inherently misleading because, by providing only a partial "summary" of projections or valuation analyses, shareholders are unable to properly assess the overall valuation picture of a company or transaction. Disclosing only a subset of available financial information, while withholding another subset of distinct financial information that would alter the overall valuation picture

38

created by the disclosed numbers, is misleading.

133.    As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Company's other shareholders have been harmed.

## COUNT II
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT)

134.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

135.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

136.    Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy and information alleged by Plaintiff to be material and necessary to disclose in the Proxy and had the ability to prevent the issuance of the misleading statements or cause the misleading statements to be corrected.

137.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The Proxy at issue contains the unanimous

recommendation of each of the Individual Defendants to approve the Transaction.  They were thus directly involved in preparing this document.

138.    In addition, in the Proxy, the Individual Defendants admit that they were involved in negotiating, reviewing, and approving the Proxy.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

139.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

140.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Company's other shareholders have been harmed.

## COUNT III

### (DERIVATIVE AND DIRECT CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES)

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    The Individual Defendants owed SI FI, and each shareholder of SI FI, fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed SI FI, and shareholders of SI FI, the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

143.    The Individual Defendants violated and breached their fiduciary duties of good

faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

144.    The Individual Defendants each knowingly, recklessly, or negligently: (i) made misleading statements that misrepresented the entirety of the proposed merger transaction and the reasons for it or failed to disclose material information concerning the proposed merger transaction; (ii) approved the issuance of such misleading statements to SI FI shareholders; (iii) failed to take actions to correct such misleading statements after they had been disseminated by the Company; (iv) failed to act independently and with due care in rejecting the various shareholder demands  to provide the material omitted information and to make the statements previously made no longer misleading; and/or (v) failed to address the misconduct of their fellow fiduciaries in allowing the aforesaid.

145.    These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, SI FI has sustained damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147.    In addition, as a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the non-Defendant shareholders of SI FI have sustained damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable in damages to the other shareholders of SI FI.

**COUNT IV**

**(AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT)**

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of SI FI and the non-Defendant shareholders of SI FI.

150.   The Individual Defendants were unjustly enriched as a result of the compensation and other perquisites they received while breaching their fiduciary duties owed to SI FI and to the non-Defendant shareholders of SI FI.

151.   Plaintiff, as a direct shareholder and as a representative of SI FI, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, perquisites and other compensation obtained by Defendants from their wrongful conduct and fiduciary breaches.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

(A)   Declaring that the Proxy is materially misleading;

(B)   Unwinding the Transaction until the Proxy is cured;

(C)   Declaring that the Individual Defendants have violated their fiduciary duties to the Class;

(D)   Rescinding the Transaction or awarding Plaintiff and the proposed class rescissory damages;

(E)   directing that Defendants account to Plaintiff for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(F)   awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

42

(G)      granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 19, 2019

**GAINEY McKENNA & EGLESTON**

By: */s/ Gregory M. Egleston*
     Gregory M. Egleston (ct19709)
Thomas J. McKenna
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

**WHITMAN BREED ABBOTT &**
**MORGAN LLC**
James C. Riley, ct00526
500 West Putnam Ave.
Greenwich, CT 06830
Telephone: (203) 869-3800
Facsimile: (203) 869-1951
Email: jriley@wbamct.com

*Attorneys for Plaintiff*

## VERIFICATION

I, SELWYN KARP, am a plaintiff in the within action. I have reviewed the allegations made in this Verified Consolidated Amended Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ 18 _____ day of June, 2019.

SELWYN KARP