## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SELWYN KARP, individually and on behalf of all
others similarly situated

     *Plaintiff*,

     v.

SI FINANCIAL GROUP, INC. et al.,

     *Defendants*.

No. 3:19-cv-00199 (MPS)

### RULING ON MOTION TO DISMISS

## I.    INTRODUCTION

Plaintiff Selwyn Karp brings this suit, on behalf of himself and all those similarly situated, alleging that the Defendants violated Rule 14a-9, promulgated under the authority of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), which prohibits the use of misleading proxy statements.  Mr. Karp, a former shareholder of Defendant SI Financial Group, Inc., alleges that the Defendants omitted numerous items from a proxy statement that were necessary for him to adequately evaluate the merits of a now-completed merger between Defendants SI Financial Group, Inc. and Berkshire Hills Bancorp.  Mr. Karp fails, however, to plausibly allege that any of these omissions made any statements in the proxy misleading—a necessary element of a claim under Rule 14a-9.  He also fails to satisfy the specificity-of-pleading standards set by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4.  Consequently, the Defendants' motion to dismiss is GRANTED with prejudice as to the Section 14(a) claim and as to the Section 20(a) control-person liability claim, which is derivative of the Section 14(a) claim.  I decline to exercise supplemental jurisdiction over the remaining state law claims and dismiss those claims without prejudice.

1

## II.   FACTUAL ALLEGATIONS

### A.   Background

Defendant SI Financial Group, Inc. ("SI FI" or "the Company") was a Maryland corporation with its principal executive offices located in Willimantic, Connecticut.  ECF No. 34 (Am. Compl.) ¶ 13.  SI FI was the parent holding company for Savings Institute Bank and Trust Company ("SI Bank").  *Id.*  SI Bank operated as a community-oriented financial institution offering a full range of financial services to consumers and businesses in its market area, including life insurance and annuities.  *Id.*  SI Bank operated 24 full-service offices throughout Windham, New London, Tolland, Hartford, and Middlesex counties in Connecticut, and Newport and Washington counties in Rhode Island.  *Id.* ¶ 33.  SI Bank attracted deposits from the general public and used those funds to originate one- to four-family residential and commercial real estate mortgage loans, commercial business loans (including time share lending, loans to condominium associations, and medical loans), and consumer loans, among other investments.  *Id.* ¶ 34.

Defendants Mark D. Alliod, Rheo A. Brouillard, Roger Engle, Donna M. Evan, Michael R. Garvey, Robert O. Gillard, Kevin M. McCarthy, Kathleen A. Nealon, Dennis Pollack, and Robert C. Cushman Sr. ("Director Defendants") were at all relevant times directors of SI FI.  *Id.* ¶¶ 14-23.  Defendant Rheo A. Brouillard was also SI FI's President and Chief Executive Officer ("CEO") at all relevant times.  *Id.* ¶ 15.  Also named as a defendant is Berkshire Hills Bancorp., Inc., which, as discussed below, has acquired SI.

### B.   Background of the Transaction

On April 27, 2016, the Board of Directors of SI FI ("the Board") approved the engagement of Keefe, Bruyette & Woods, Inc. ("KBW") to provide financial advisory and investment banking services to SI FI in connection with a possible business combination with

another company. *Id.* ¶ 44. Thereafter, SI FI management, with KBW's assistance, selected

seven (7) financial institutions to contact regarding a possible business combination from among

twelve (12) candidates KBW had previously reviewed with the Board. *Id.*

      In June 2016, KBW contacted the seven financial institutions. *Id.* ¶ 45. Of the seven, six

signed non-disclosure agreements, and four requested and received a confidential information

memorandum regarding the Company. *Id.* All four of the financial institutions that received the

confidential information memorandum elected not to proceed with a business combination with

SI FI. *Id.* Defendant Berkshire Hills Bancorp ("Berkshire") indicated that it needed time to

integrate its recently announced acquisition of First Choice Bank but would be interested in

discussing a transaction at a later date. *Id.*

      On August 2, 2016, Defendant Brouillard, CEO of SI FI, encountered the CEO of one of

the financial institutions that had been contacted by KBW (referred to in the Proxy as "Company

A") at an industry event, where they agreed to meet subsequently to discuss a possible business

combination between SI FI and Company A. *Id.* ¶ 46. On December 1, 2016, Company A

submitted a non-binding indication of interest with respect to the acquisition of the Company in a

100% stock transaction with a fixed exchange ratio. *Id.* ¶ 47. On December 8, 2016, the Board

approved the negotiation of a definitive agreement with Company A on the terms reflected in

Company A's indication of interest letter. *Id.* ¶ 48. On December 14, 2016, SI FI and Company

A entered into a letter agreement pursuant to which SI FI agreed to negotiate exclusively with

Company A until January 31, 2017. *Id.* In late January 2017, discussions slowed pending

resolution of certain due diligence matters. *Id.* In late April 2017, Company A communicated

that it would not be able to proceed with a transaction. *Id.* at ¶ 49.

In early January 2018, the CEO of a financial institution referred to in the Proxy as "Company C" contacted Defendant Brouillard about meeting to discuss a possible business combination.  *Id.* ¶ 50.  On January 10, 2018, Defendant Brouillard met with the CEO of Company C, who provided a non-binding indication of interest letter with respect to a business combination with SI FI for a 100% stock transaction in which shares of SI FI common stock would be converted into shares of Company C common stock with a value of $14.05.  *Id.* ¶ 51. On April 24, 2018, Company C verbally communicated to SI FI that Company C would increase the value of the merger consideration to $14.40.  *Id.* ¶ 52.  Thereafter, the SI FI Board concluded that the indicated value of the transaction with Company C was insufficient and discontinued discussions with Company C.  *Id.*

On October 19, 2018, Michael Daly ("Daly"), then the President and CEO of Berkshire, contacted Brouillard to express interest in a possible combination between Berkshire and SI FI. *Id.* ¶ 53.  That same day, the CEO of another financial institution, referred to in the Proxy Statement as "Company D," contacted Brouillard to express interest in a possible combination between Company D and SI FI.  *Id.*

On October 23, 2018, Berkshire delivered a draft indication of interest letter that proposed the acquisition of SI FI by Berkshire in a 100% stock transaction with a fixed exchange ratio of between 0.43 and 0.45 shares of Berkshire common stock for each share of SI FI common stock.  *Id.* ¶ 54.

On October 31, 2018, representatives of Company D met with Brouillard to discuss a potential business combination between their respective companies.  *Id.* ¶ 55.  Brouillard informed them that the SI FI Board planned to meet on November 2, 2018, to discuss an indication of interest from another company and that Company D would need to provide an

indication of interest before that date in order to be considered as a possible partner for a business combination.  *Id.*  On that same day, representatives of SI FI and Berkshire finalized the form of exclusivity agreement and Berkshire provided an updated draft of its indication of interest letter, which continued to reflect an exchange ratio of 0.43 to 0.45 shares of Berkshire common stock for each share of SI FI common stock.  *Id.* ¶ 56.

On the afternoon of November 1, 2018, Company D delivered an indication of interest letter that proposed a 100% stock transaction valued at $15.50 per share, with a fixed exchange ratio established at the time of signing a definite merger agreement.  *Id.* ¶ 57.  Company D's indication of interest letter indicated that Company D would select and appoint two members of the SI FI Board to the board of directors of Company D's bank subsidiary.  *Id.*  Company D's indication of interest letter did not provide that any of SI FI's executive officers would join Company D's executive management team.  *Id.*

That same evening, Daly, then the President and CEO of Berkshire, and Brouillard, together with the parties' respective financial advisors, discussed Berkshire's indication of interest letter.  *Id.* ¶ 58.  Later that evening, Berkshire delivered a revised indication of interest letter that proposed a 100% stock transaction with a fixed exchange ratio of 0.46 shares of Berkshire common stock, which had an indicated value of $15.51 based on the closing price of Berkshire common stock on November 1, 2018.  *Id.*  Berkshire's revised indication of interest letter indicated that Berkshire would offer one seat on its board of directors to a current director of SI FI.  *Id.*  The letter did not provide that any of SI FI's executive officers would join Berkshire's executive management team.  *Id.*

On November 2, 2018, the SI FI Board met to discuss the non-binding indication of interest letters from Berkshire and Company D.  *Id.* ¶ 59.  KBW reviewed and compared the

terms of the transactions proposed by Berkshire and Company D, provided an overview of Berkshire and Company D and their respective financial performance, reviewed the market performance of SI FI, Berkshire, and Company D, and reviewed financial aspects of each of the proposed transactions. *Id.* After considering the risks and benefits of each of the proposed transactions, including the proposed consideration to be received by holders of SI FI common stock, the perceived prospects for each of Berkshire and Company D, and the perceived impact of each transaction on the employees of and communities served by SI FI, as well as the fact that both Berkshire and Company D required SI FI to agree to negotiate exclusively with them, the SI FI Board authorized management to negotiate a definitive agreement with Berkshire on the terms set forth in Berkshire's indication of interest letter and to enter into non-disclosure and exclusivity agreements with Berkshire. *Id.* Because Berkshire did not have branches located in the markets served by SI FI, the SI FI Board instructed management to request that Berkshire agree to form an advisory board comprised of the current directors of SI FI. *Id.*

Later that same day, on November 2, 2018, SI FI and Berkshire executed a mutual non-disclosure agreement and an exclusivity agreement requiring SI FI to negotiate exclusively with Berkshire for a period of 30 days. *Id.* ¶ 60. On December 1, 2018, SI FI and Berkshire extended their exclusivity agreement to December 16, 2018. *Id.* ¶ 61.

On December 5, 2018, Company D delivered to SI FI an unsolicited non-binding indication of interest letter that proposed a 100% stock transaction valued at $16.00 per share, with a fixed exchange ratio established at the time of signing a definitive merger agreement. *Id.* ¶ 62. Company D expressed a willingness to provide up to 30% of the merger consideration in the form of cash should SI FI prefer. *Id.* Consistent with its original indication of interest letter, Company D's updated indication of interest letter stated that Company D would select and

appoint two members of the SI FI Board to the board of directors of Company D's bank subsidiary and did not provide that any of SI FI's executive officers would join Company D's executive management team.  *Id.*  Company D's updated indication of interest letter stated that consummation of a transaction would be subject to completion of due diligence in a manner satisfactory to Company D and required that SI FI agree to negotiate exclusively with Company D.  *Id.*  At SI FI's direction, representatives of KBW communicated the financial terms of Company D's indication of interest (without identifying Company D) to representatives of Piper Jaffray, the financial advisor to Berkshire.  *Id.*

On December 6, 2018, Berkshire verbally communicated that it would increase the exchange ratio in the merger to 0.48 shares of Berkshire common stock for each share of SI FI common stock, which had an indicated value of $15.48, based on the closing price of Berkshire common stock on that date.  *Id.* ¶ 63.  Berkshire also communicated that it had completed its due diligence and was ready to approve and execute the merger agreement and that the exchange ratio of 0.48 was the most that Berkshire would offer.  *Id.*  Berkshire indicated its intention to pursue other strategic alternatives should SI FI allow the exclusivity period with Berkshire to lapse and thereafter commence discussions with Company D.  *Id.*

As stated in the Proxy, Company D's offer proposed a 100% stock transaction valued at $16.00 per share, with a fixed exchange ratio established at the time of signing a definitive merger agreement and, in the alternative, that 30% of the merger consideration paid by Company D could be in the form of cash to lessen the exchange ratio risk.  *Id.* ¶ 64.  Berkshire's offer was based on a stated fixed exchange ratio of 0.48; Plaintiff and all other shareholders did not know and could not determine what price per share they would receive at the completion of the merger. *Id.*  In order for Plaintiff and all other shareholders to receive $16.00 per share at the conclusion

of this merger, Berkshire's closing share price on that date would have to meet or exceed $33.35. *Id.* Since the announcement of the merger (on December 11, 2018), Berkshire's stock has never closed at or above that price. *Id.*

On December 7, 2018, the Board met and approved continuing to finalize the transaction with Berkshire under the terms of its revised proposal. *Id.* ¶ 65. On December 11, 2018, the Board met, KBW delivered its fairness opinion, and the Board approved and adopted the Merger Agreement and the transactions contemplated by it. *Id.* ¶ 66. On the same date, Berkshire and SI FI executed the Merger Agreement and issued a joint press release announcing the transaction. *Id.* ¶¶ 67-68.

**C.      Company Insiders' Interests in the Transaction**

Plaintiff alleges that the Company's insiders are the primary beneficiaries of the merger between SI FI and Berkshire ("the Transaction"), not the SI FI shareholders. *Id.* ¶ 70. According to Plaintiff, the Company's Board and its executive officers were conflicted because they secured unique benefits for themselves from the Transaction not available to Plaintiff and the Company's shareholders. *Id.*

On December 11, 2018, Berkshire, Berkshire Bank, SI FI, SI Bank, and Laurie L. Gervais—SI FI's Chief Operating Officer—entered into an agreement ("the Gervais Agreement") by which (a) Gervais agreed to exercise all of her vested Company stock options prior to January 1, 2019, and SI FI agreed to take all actions necessary to facilitate the exercise of Gervais's Company stock options, including, if requested by Gervais, amending her option award agreements to permit a net settlement to satisfy the exercise price and applicable tax withholding; (b) Gervais agreed to dispose of all shares of Company common stock acquired pursuant to provision (a) upon exercise of incentive stock options (such disposition to occur prior

to January 1, 2019); and (c) Gervais agreed that the compensation income resulting from the exercise of vested stock options and the disposition of shares of Company common stock acquired upon such exercise pursuant to the agreement would be excluded from the calculation of severance or other benefits payable to Gervais, including Gervais's cash severance payment under the Change in Control Agreement between SI FI and Gervais, the allocation of shares under the Company Employee Stock Ownership Plan and Trust ("ESOP"), and benefits payable under the Supplemental Executive Retirement Plan between SI FI and Gervais. *Id.* ¶ 72.

The Gervais Agreement also provided that for the period beginning on the day following Gervais's termination from SI FI and continuing for a period of six (6) months, Gervais would provide consulting services to Berkshire including regarding the integration of the two companies. *Id.* ¶ 73. In consideration for Gervais's consulting services, the agreement provided that Berkshire would pay Gervais a monthly fee of $5,450.00 in exchange for her availability for up to thirty-two (32) hours per month. *Id.* ¶ 74. Gervais also agreed to non-competition and non-solicitation restrictions in exchange for twelve monthly payments totaling $100,000. *Id.*

On December 11, 2018, Berkshire, Berkshire Bank, SI FI, SI Bank, and Lauren L. Murphy—then Executive Vice President of SI FI—entered into an agreement (the "Murphy Agreement"). *Id.* ¶ 75. The agreement contained provisions related to the exercise of Murphy's vested Company stock options substantially similar to the analogous provisions in the Gervais Agreement. *Id.* The Murphy Agreement further provided that, prior to December 31, 2018, SI FI would make a lump-sum cash payment to Murphy in the amount of $280,000, less applicable taxes and withholding. *Id.* The agreement included a provision that Murphy "acknowledges that this payment is in partial satisfaction of the cash severance payment that would otherwise be payable under [Murphy's Change in Control Agreement] . . . ." *Id.* The Murphy Agreement

further provided that the remainder of the severance payment due under Murphy's Change in Control Agreement ("Murphy's CIC Agreement") would be paid subject to the terms and conditions of that agreement, and that Murphy agreed that this payment would be excluded from the calculation of severance or other benefits payable to her, including her cash severance payment under her CIC Agreement, the allocation of shares under the Company ESOP, and benefits payable under the Supplement Executive Retirement Plan between SI Bank and Murphy.  SI FI and SI Bank, and their successors and assigns, agreed to defend, indemnify and hold Murphy harmless for any additional taxes, penalties, and interest assessed against her pursuant to Section 409A of the Internal Revenue Code and the regulations promulgated thereunder ("Section 409A") with regard to the $280,000 payment.  *Id.*  Berkshire agreed to pay Murphy an additional payment for any such additional taxes, penalties, and interest that might be assessed under Section 409A, such that Murphy would be in the same economic position that she would have occupied had such payment not been determined to be noncompliant with Section 409A.  *Id.*

Defendant Brouillard also entered into an agreement with Berkshire, Berkshire Bank, SI FI, and SI Bank on December 11, 2018 (the "Brouillard Agreement).  *Id.* ¶ 77.  The agreement contained provisions related to the exercise of Brouillard's vested Company stock options substantially similar to the analogous provisions in the Gervais Agreement and the Murphy Agreement.  *Id.*

According to the December 11, 2018 press release announcing the Transaction, "[k]ey business leaders from [SI FI] [were to] remain with Berkshire Bank in continuing leadership roles."  *Id.* ¶ 78.

SI FI's named executive officers received substantial cash severance payments in connection with the Transaction, as set forth in the following table:

| Named Executive | Cash ($) | Equity ($) | Pension/ NQDC ($) | Perquisites /Benefits ($) | Total ($) |
|---|---|---|---|---|---|
| Rheo A. Brouillard | 1,980,045 | – | 193,314 | 61,883 | 2,235,242 |
| Laurie L. Gervais | 987,535 | – | 136,758 | 26,650 | 1,150,943 |
| Paul R. Little | 808,765 | 5,560 | – | 62,398 | 876,723 |
| Lauren L. Murphy | 400,702 | – | 1,047,283 | 62,398 | 1,510,383 |
| Jonathan S. Wood | 498,622 | – | – | 31,717 | 530,339 |

*Id.* ¶ 79.

In addition, following the completion of the merger, Berkshire Bank agreed to establish an advisory board and invite those individuals who served on the SI FI Board as of the date of the merger agreement, other than Brouillard, to join the advisory board. *Id.* ¶ 80. The claimed function of the advisory board was, among other things, to provide support and continuity to the combined company. *Id.* The advisory board was expected to meet as requested by the board of directors of Berkshire Bank from after the effective time of the merger for a term of one year, and each member of the advisory board would be paid an annual retainer fee of $10,000. *Id.* Berkshire also agreed to give Defendant Brouillard a seat on Berkshire's board of directors upon completion of the Transaction. *Id.* ¶ 71.

The merger agreement provided that, for six years after the effective time of the merger, Berkshire would maintain SI FI's existing directors' and officers' liability insurance policy or a comparable policy. *Id.* ¶ 81. Berkshire and the surviving corporation agreed to indemnify, defend, and hold harmless each current and former director, officer, or employee of SI FI or its subsidiaries in connection with claims and investigations relating to (a) the fact that such person is or was a direct, officer, or employee of SI FI or any of its subsidiaries, or was serving at SI

FI's request in similar capacities on behalf of another entity, or (b) matters in connection with the transactions contemplated by the merger agreement. *Id.* Berkshire also agreed to advance expenses as incurred to the fullest extent permitted under applicable law. *Id.*

**D.    The Proxy**

On February 4, 2019, Defendants filed a proxy with the SEC ("the Proxy") and disseminated it to SI FI's shareholders. *Id.* ¶ 82. The Proxy solicited the Company's shareholders to vote in favor of the Transaction. *Id.* On February 26, 2019, this document was refiled with virtually identical content on Form DEFM 14A. *Id.* According to Plaintiff, the Proxy was incomplete and misleading. *Id.*

**1.    Disclosures Related to Company D's Interest Letter**

The Proxy disclosed that on December 5, 2018, the Company received an indication of interest letter from Company D to acquire SI FI in a stock transaction valued at $16.00 per share, and that Company D expressed a willingness to provide up to 30% of the merger consideration in the form of cash, which would reduce the risk for SI FI shareholders should the acquiror's share price decline. *Id.* ¶ 84. The Proxy failed to disclose or provide to the Company shareholders: (a) an overview of Company D; (b) Company D's financial performance; (c) the financial projections of a combined company (D and SI FI), if any; (d) Company D's market/business locations; (e) detailed financial aspects of Company D's proposed transaction; and (f) an explanation that the potential downside risk of the merger is lessened if 30% of the purchase price is paid in cash rather than in stock of the acquiring company. *Id.* ¶ 85. According to Plaintiff, the disclosures and rationales set forth in the Proxy for selecting the Berkshire merger offer over the Company D merger offer were materially insufficient and negatively impacted Plaintiff's ability to make an informed voting decision. *Id.* ¶ 86.

2.      **Disclosures Related to KBW's Fairness Opinion and Analysis**

The Proxy described KBW's fairness opinion and the various valuation analyses

performed in support of its opinion. *Id.* ¶ 101. These sections of the Proxy failed, however, to

disclose key inputs and assumptions underlying these analyses. *Id.* Without this information, SI

FI's shareholders were unable to fully understand these analyses, and thus, were unable to

determine what weight, if any, to place on KBW's fairness opinion in determining whether to

vote in favor of the Transaction. *Id.* According to Plaintiff, this omitted information, if

disclosed, would have significantly altered the total mix of information available to SI FI's

shareholders. *Id.*

a.      **Rationale for KBW's Discount Rate Assumptions**

As part of its fairness opinion and analysis, KBW performed discounted cash flow

("DCF") analyses for both SI FI and Berkshire. Id. *¶ 88.* For SIFI, KBW applied a discount rate

range of 12-15% and arrived at a range of values of $12.13 to $16.29 per share. *Id.* However, in

the Proxy, KBW and Defendants failed to provide information regarding how KBW determined

and/or set this discount rate range and whether it reflected SI FI's weighted average cost of

capital ("WACC"). *Id.* For Berkshire, KBW applied a discount range of 10-13% and arrived at

a range of values of $32.22 to $45.80 per share. *Id.* ¶ 89. However, KBW and Defendants did

not provide information in the Proxy regarding how it determined and/or set this discount rate

range and whether it reflects Berkshire's WACC. *Id.*

According to Plaintiff, these key inputs are material to SI FI shareholders, and their

omission renders the summary of KBW's DCF analysis in the Proxy incomplete and misleading.

*Id.* ¶ 90. These inputs can have a significant effect on the final valuation, and it is difficult to

rely on, compare, or analyze a valuation underlying a fairness opinion unless full disclosure is

made of the various inputs in the valuation process, the weight assigned to each, and the rationale underlying these choices. *Id.* ¶ 91. Without this information, SI FI shareholders could not evaluate the reliability of KBW's DCF analysis, make a meaningful determination of whether the illustrative present value per share reference ranges reflected the true value of the Company or were the result of KBW's unreasonable judgment, or make an informed decision regarding whether to vote for the merger. *Id.* ¶ 92.

**b.     Free Cash Flow Projections**

In addition, KBW provided no projections for free cash flow ("FCF") in performing its DCF analysis for both companies. *Id.* ¶ 93. In the Proxy, the only projections for SI FI include projected earnings per share for 2019 and 2020 of $0.99 and $1.07, respectively, and an assumed growth rate of 8% per year for 2021 and beyond. *Id.* For Berkshire, the Proxy include "Street" estimates of $2.91 and $3.10 for 2019 and 2020 respectively, and an assumed growth rate of 6% per year thereafter. *Id.*

According to Plaintiff, Defendants' failure to include FCF projections in the Proxy made the relevant section of the Proxy materially misleading. *Id.* ¶ 94. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected net income. *Id.* (citing Cornelius J. Casey and Norman J. Bartczak, *Cash Flow—It's Not the Bottom Line*, Harvard Bus. Rev. (1984) ("A growing number of securities analysts, financial writers, and accounting policymakers contend that financial statements providing information of a company's cash flows yield a better measure of operating performance than do the company's income statement and balance sheet. According to recent surveys, corporate and government officials have accepted this view; they rated cash flow data the most important piece of information contained in

published financial statements.")).  *Id.* ¶ 94.  While a company's net income is informed by various accounting assumptions, free cash flow is an objective measure, based on the cash coming in and the cash going out.  *Id.* ¶¶ 95, 97.  "The main advantage that free cash flow has over earnings is that it can't be manipulated as much."  *Id.* ¶ 97 (quoting David Thomas, *Why Free Cash Flow Is Better Than Earnings, Shares, and Stock Markets* (July 29, 2013), https://sharesandstockmarkets.com/free-cash-flow-v-earnings).

The Proxy also only disclosed financial projections for the fiscal years 2019 and 2020— less than half the amount of time that KBW had access to and utilized when preparing its DCF analysis in support of its fairness opinion.  *Id.* ¶ 98.  As a result, SI FI shareholders could not compare net income, or any other projection metrics, to SI FI's free cash flows for the full time period.  *Id.*

Defendants also failed to provide in the Proxy any identification or information relating to the metrics required to estimate excess cash flows during the forecast period, which were used and relied on by KBW in its DCF analyses, making this section of the Proxy materially misleading.  *Id.* ¶ 100.

c.      **Disclosures Related to Other Analyses by KBW**

With respect to KBW's *Berkshire Hills Bancorp Selected Companies Analysis* and *SI Financial Selected Company Analysis*, the Proxy failed to disclose: (a) the individual multiples and financial metrics for each of the selected companies analyzed by KBW; and (b) any benchmarking analyses for SI FI in relation to the companies analyzed by KBW.  *Id.* ¶ 102.

With respect to KBW's *Selected Transactions Analysis*, the Proxy failed to disclose: (a) the individual multiples and financial metrics for each of the selected transactions analyzed by

KBW; and (b) any benchmarking analyses for SI FI in relation to the target companies analyzed by KBW.  *Id.* ¶ 103.

With respect to KBW's *Relative Contribution Analysis*, the Proxy failed to disclose the 2018-2020 GAAP Net Income figures used in the analysis for both SIFI and Berkshire.  *Id.* ¶ 104.

With respect to KBW's *Forecasted Pro Forma Financial Impact Analysis*, the Proxy failed to disclose: (a) the closing balance sheet estimates as of June 30, 2019 for Berkshire and SI FI, extrapolated from historical data using growth rates for SI FI and Berkshire provided by Berkshire management; (b) the *pro forma* assumptions provided by Berkshire, including, among other things, the cost savings and related expenses expected to result from the merger and certain accounting adjustments and restructuring charges assumed with respect thereto and financial forecasts and projections relating to the net income of SI FI; and (C) the specific earnings per share and tangible book value per share accretion and dilution figures resulting from the analysis as well as the specific estimates of *pro forma* Berkshire's tangible common equity to tangible assets ratio, Tier 1 Leverage Ratio, Common Equity Tier 1 Ratio, Tier 1 Risk-Based Capital Ratio, and Total Risk Based Capital Ratio as of June 30, 2019.  *Id.* ¶ 105.

### 3.     Disclosures Related to Insiders' Interests

As noted, certain Company insiders secured positions for themselves with the combined company.  *Id.* ¶ 108.  For example, Defendant Brouillard was to join the board of directors of Berkshire and Berkshire Bank upon completion of the Transaction.  *Id.*  Additionally, Berkshire Bank was to create an advisory board and invite each of the Director Defendants, other than Defendant Brouillard, to join the advisory board.  *Id.*  Moreover, Defendant Gervais entered into an agreement with SI FI and Berkshire pursuant to which she would provide consulting services

to Berkshire following completion of the Transaction and an additional payment as consideration for certain restrictive covenants.  *Id.*  Further, according to the December 11, 2018 press releases announcing the transaction, "[k]ey business leaders from SI FI will remain with Berkshire Bank in continuing leadership roles."  *Id.*

The Proxy failed, however, to disclose the details of all employment-related discussions and negotiations that occurred between the Company and Berkshire executive officers and directors, including who participated in such communications, when they occurred, and their content.  *Id.* ¶ 109.  The Proxy further failed to disclose whether any of Berkshire's prior proposals or indications of interest mentioned management retention in the combined company.  *Id.*  This information was necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries form acting solely in the best interest of the Company's stockholders.  *Id.* ¶ 110.  According to Plaintiff, the omission of this information rendered the statements in the "Background of the Merger" and "Interests of SI Financial's Directors and Executive Officers in the Merger that are Different From Yours" sections of the Proxy Statement materially misleading in violation of the Exchange Act.  *Id. ¶ 111.*

According to Plaintiff, while the Defendants provided some information and a chart regarding certain named executive officers' anticipated substantial cash severance payments in connection with the Transaction, the Proxy created confusion and was incomplete and materially misleading regarding the Gervais Agreement and the Murphy Agreement and the terms in each related to the exercise of their vested Company stock options.  *Id.* ¶ 87.

### E.    Plaintiff's Demand

On February 8, 2019, the Plaintiff filed a complaint setting forth demands that the Board of SI FI provide further material information regarding the proposed merger transaction with Berkshire by issuing a public supplement to the S-4 disclosing the additional material information to the shareholders of SI FI. *Id.* ¶ 112. On the same date, the Plaintiff also made a further demand upon the board by letter to provide further material information regarding the Transaction with Berkshire. *Id.* ¶ 113. The Board of SI FI refused to act upon this demand. *Id.* ¶ 114. This refusal by the Board of SI FI to act upon the demand was wrongful and a breach of the Board's fiduciary duties. *Id.* ¶ 115.

Thereafter, several other shareholders also filed suit making demands upon the Board to provide supplemental material information about the Transaction. *Id.* ¶ 116. Other shareholders also made demand by letter upon the Board to disclose further material information about the Transaction. *Id.* ¶ 117. The Board also refused to act upon these additional demands. *Id.* ¶ 118.

## III.   LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). In considering such a motion, the court must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). To survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across

the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010).  "When a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims, it is appropriate to grant defendants['] motion to dismiss."  *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004).

Claims brought under the Exchange Act must also comply with the heightened pleading standards established by the Private Securities Litigation Reform Act ("PSLRA").  As relevant here, the PSLRA provides as follows:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> > (A) made an untrue statement of a material fact; or
> >
> > (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. §78u-4(b)(1); *see also Bond Opportunity Fund v. Unilab Corp.*, 87 Fed. Appx. 772, 773 (2d Cir. 2004) (applying the PSLRA heightened pleading requirements to a Section 14(a) claim).

## IV.    DISCUSSION

## A.    The Section 14(a) Claim

Plaintiff claims that Defendants' omissions from the Proxy constituted violations of Section 14(a) of the Exchange Act.  Under Section 14(a)(1) of the Exchange Act, it is unlawful to solicit proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15

U.S.C. § 78n(a).  One such rule, Rule 14a-9, prohibits solicitation by means of a proxy statement "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."  17 C.F.R. § 240.14a-9.  Thus, "omission of information from a proxy statement will violate these provisions if either the SEC regulations specfically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading."  *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002); *see also Hysong v. Encore Energy Partners LP*, 2011 WL 5509100, at *8 (D. Del. Nov. 10, 2011) ("A plaintiff's desire to know information that may be material . . . is not enough to state a claim under Section 14(a) under ordinary pleading requirements.  He must point to a statement that is misleading, or is made misleading by operation of a material omission." (footnote omitted)); *IBEW Local 98 Pension Fund v. Cent. Vermont Pub. Serv. Corp.*, 2012 WL 928402, at *11–12 (D. Vt. Mar. 19, 2012) ("As a threshold matter, contrary to Plaintiffs' contentions, the standard for alleging a section 14(a) violation is not solely whether the information omitted from a proxy statement is 'material.'  To the contrary, the plain language of Rule 14a-9 requires a plaintiff to show both materiality and a false or misleading statement as a result of the omission."); *cf. Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) ("[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011))).[1]  In the context of a proxy

---

[1] The relevant language of Rule 10b-5 is substantially similar to that of Rule 14a-9.  *Compare* 17 C.F.R. § 240.10b-5(b) (making it unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" "in connection with the purchase or sale of any security") *with* 17 C.F.R. § 240.14a-9 (prohibiting solicitation by means of a proxy statement that "omits to state any material fact necessary in order to make the statements therein not false or misleading").

statement, "a fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Resnik*, 303 F.3d at 151 (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991)).

Here, the Plaintiff does not contend that SEC regulations mandate the disclosure of the information allegedly omitted from the Proxy.  Defendants argue that Plaintiff has also failed to adequately allege that the omitted information made any statement in the Proxy misleading.  I agree.

The bulk of Plaintiff's allegations concern omitted financial metrics and assumptions relied on by KBW, the Board's financial advisor, in developing its fairness opinion.  For example, Plaintiff alleges that Defendants omitted information regarding how KBW set the discount rates for its DCF analysis.  Am. Compl. ¶¶ 88-89.  This omission, according to Plaintiff, renders the summary of KBW's DCF analysis in the Proxy incomplete and misleading.  *Id.* ¶ 90. Plaintiff fails to allege any facts, however, to support this conclusion.  Rather, all of Plaintiff's non-conclusory allegations speak to the *materiality* of the omissions.  *See, e.g.*, Am. Compl. ¶ 92 ("Without the above-mentioned information, SI FI shareholders could not evaluate for themselves the reliability of KBW's [DCF Analysis], make a meaningful determination of whether the illustrative present value per share reference ranges reflect the true value of the Company or was the result of KBW's unreasonable judgment, or make an informed decision regarding whether to vote for the merger.").  As helpful as this information might have been to investors, Plaintiff fails to allege any facts suggesting that its absence made any statement in the Proxy misleading.  And he certainly does not "specify [any] statement" that was made misleading as a result of these omissions, let alone provide "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

The same can be said of the omission of free cash flow figures, financial projections

beyond 2020, metrics required to estimate excess cash flows, and assumptions used in the

selected company analysis, selected transactions analysis, relative contribution analysis, and

forecasted pro forma financial impact analysis.  The Amended Complaint includes numerous

allegations that speak to the usefulness of these metrics and their importance in informing a

shareholder's voting decision—that is, their *materiality*—but no non-conclusory allegation that

these omissions rendered any statement in the Proxy false or misleading.  The plain language of

Rule 14a-9 unambiguously requires that an omission render a statement in the Proxy misleading

in order to trigger liability under the Rule.  *See* 17 C.F.R. § 240.14a-9 (prohibiting the use of a

Proxy that "omits to state any material fact *necessary in order to make the statements therein not*

*false or misleading*") (emphasis added).

The Second Circuit's holding in *Resnik v. Swartz* is instructive.  There, the plaintiff

claimed that the omission of a financial metric regarding the value of stock options awarded to

directors—the "Black-Sholes" value of the options—constituted a violation of Section 14(a).

*Resnik*, 303 F.3d at 150.  The Court first determined that SEC regulations did not explicitly

require the disclosure of this metric.  *Id.* at 153.  Turning to the plaintiff's Rule 14a-9 claim—

that is, the claim that "the absence of this information renders certain statements in the proxy

statement materially misleading," *id.*—the Court analyzed each specific statement that the

plaintiff alleged to be misleading as a result of the omission and, upon finding that the plaintiff

had failed to plausibly allege that any statements were rendered misleading, affirmed the District

Court's dismissal of the claim.  The Court explained:

> Disclosure of an item of information is not required, however, simply because it
> may be relevant or of interest to a reasonable investor. For an omission to be
> actionable, the securities laws must impose a duty to disclose the omitted
> information. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d

Cir.1993). Here, no duty of disclosure has been established. As noted above, the relevant rule of the Commission, Item 402(g) of Regulation S–K, does not require disclosure of the present value of Plan options on the grant date. Similarly, this information is not required to make other information presented in the proxy statement not materially false or misleading.

*Id*. at 154.  Quoting the Delaware Court of Chancery, the Court further explained:

Judgments concerning what disclosure, if any, of estimated present values of options should be mandated are best made . . . not by a court under a very general materiality standard, but by an agency with finance expertise. An administrative agency—the Securities and Exchange Commission—has a technical staff, is able to hold public hearings, and can, thus, receive wide and expert input, and can specify forms of disclosure, if appropriate. It can propose rules for comment and can easily amend rules that do not work well in practice.

*Id*. at 154–55 (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 323–33 (Del. Ch. 1997)).  Here, as in *Resnik*, if the Plaintiff believes that the disclosure of certain metrics should be mandatory, "his remedy is to advocate a change in the regulations before the Commission."  *Id.* at 155.

The other alleged omissions fare no better.   Plaintiff claims, for example, that "the Proxy failed to disclose the details of all employment related discussions and negotiations that occurred between the Company and [Berkshire] executive officers and directors, including who participated in such communications, when they occurred and their content."  Am. Compl. ¶ 109. Plaintiff again alleges why this information might be material.  *See id.* ¶ 110 ("This information was necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.").  He also makes a conclusory allegation that "the omission of this information rendered the statements in the 'Background of the Merger' and 'Interests of SI Financial's Directors and Executive Officers in the Merger that are Different From Yours' sections of the Proxy Statement materially misleading in contravention of the Exchange Act."  *Id.* ¶ 111.  But Plaintiff again fails to make any non-conclusory allegations suggesting that the omissions in fact rendered any statement in

the Proxy false or misleading.  The same is true of the alleged omissions of information related to Company D's interest letter.

Plaintiff's failure to provide factual support for his conclusory allegations is particularly stark in light of the heightened pleading standards that apply to this case under the PSLRA.  As noted, under the PSLRA, a private plaintiff alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading" must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. Sec. 78u-4(b)(1); *see also Beck ex rel. Equity Office Properties Tr. v. Dobrowski*, 2007 WL 3407132, at *6 (N.D. Ill. Nov. 14, 2007) ("Plaintiff was required to allege not just that Defendants made . . . omissions, but that those omissions rendered statements that Defendants actually made misleading. *See* 17 C.F.R. § 240.14a-9(a). Plaintiff was further required by the PSLRA to explain how any information allegedly omitted from the proxies had such an effect on a specific statement actually made. 15 U.S.C. § 78u-4(b)(1)."), *aff'd, Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009).  Plaintiff's conclusory allegations that the omission of certain assumptions and metrics rendered whole sections of the Proxy misleading, *see, e.g.*, Am. Compl. ¶ 94 ("Defendants' failure to include FCF projection in its Proxy made that section of the Proxy materially misleading."), do not satisfy normal plausibility pleading standards, let alone the heightened standard set forth in the PSLRA, which, again, requires a specification of "*each statement alleged to have been [made] misleading*," as well as "the reason or reasons why [each such] statement is misleading."  15 U.S.C. § 78u-4(b)(1) (emphasis added).  *See, e.g.*, *In Re 2007 Novastar Financial Inc., Sec. Lit.*, 579 F.3d 878, 882–83 & n.3 (8th Cir. 2009) (upholding dismissal of securities fraud claim under PSLRA where plaintiff referred to 36-page section of

complaint describing press releases and other communications as the location of allegedly misleading statements: "Absent from this section (and from every other section of the complaint), however, is any indication of what specific statements within these communications are alleged to be false or misleading"; "[t]he press release [one of the communications to which plaintiff pointed] includes a plethora of statements, but the complaint gives no indication of which statements [plaintiff] alleges were false or misleading.").

All of the authorities Plaintiff cites are either inapposite or clearly distinguishable.  Many of these cases do not involve Rule 14a-9 claims at all.  For example, Plaintiff cites multiple decisions by Delaware state courts applying Delaware law.  *See, e.g.*, *In re Lear Corp. Shareholder Litigation*, 926 A.2d 94,114–15 (Del. Ch. 2007) (holding that disclosure of material information was required under Delaware law); *In re Atheros Communs., Inc. S'holder Litig.*, 2011 WL 864928, at *11 (Del. Ch. Mar. 4, 2011) (same); *see also In re Am. Capital S'holders Litig.*, 2016 Md. Cir. Ct. LEXIS 13, at *28–29 (Md. Cir. Ct. Oct. 12, 2016) (applying Delaware law).  But Delaware law, unlike Rule 14a-9, includes a general prohibition on the omission of material facts.  Under Delaware law, "[c]orporate fiduciaries can breach their duty of disclosure . . . by making a materially false statement, *by omitting a material fact*, or by making a partial disclosure that is materially misleading." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (emphasis added).  In other words, in addition to prohibiting "making a partial disclosure that is materially misleading"—analogous to the Rule 14a-9 prohibition against the omission of materials facts that are necessary to make the statements made not misleading—Delaware law also includes a general prohibition on "omitting a material fact." *Id.*  The Plaintiff's attempts to obfuscate this distinction are unconvincing.  While Plaintiff's allegations may be sufficient under Delaware law, they are not sufficient under Section 14(a) and Rule 14a-9.

The cases Plaintiff cites that do apply Rule 14a-9 do not help him here.  In the vast majority of these cases, the plaintiff had made non-conclusory allegations that the alleged omission rendered statements in the Proxy misleading.  For example, in *Smith v. Robbins & Myers, Inc*, the plaintiff also alleged the omission of some of the assumptions used in the financial advisor's DCF analysis.  969 F. Supp. 2d 850, 871 (S.D. Ohio 2013).  But the plaintiff further alleged, for example, that the financial advisor had utilized a "grossly inflated 'weighted average cost of capital' ("WACC") . . . driving down the valuation of a company," *id.* at 858, and that using a "reasonable WACC . . . would have resulted in a significantly higher valuation of [the Defendant], resulting in the larger consideration falling outside and below the range of fairness," *id.* at 871.  Similarly, the plaintiff alleged that the financial advisor had failed to account for the control premium in its analysis, as was customary, rendering the fairness opinion inaccurate.  *Id.* at 873.  Here, by contrast, the Plaintiff has failed to make any non-conclusory allegations suggesting that statements in the Proxy, including the fairness opinion, were misleading, as a result of an omission or otherwise.

To the extent that some of the authorities cited by the Plaintiff suggest that an omission can violate Rule 14a-9 absent misleading statements in the Proxy, these authorities contradict binding Second Circuit precedent.  For example, Plaintiff filed a notice of supplemental authority citing *Karp v. First Connecticut Bancorp, Inc.*, 2019 WL 4643799, at *4 (D. Md. Sep. 24, 2019), a case also brought by the Plaintiff in this case and involving similar allegations.  There, the Court concluded that the Plaintiff had stated a claim under Rule 14a-9, rejecting the Defendant's argument that the alleged omissions did not constitute violations of Rule 14a-9 because they did not render any statements in the Proxy misleading.  *Id*.  But while the Court concluded that "Plaintiffs have provided detailed allegations explaining why the omissions made other

statements misleading," *id.*, the allegations it recites suggest only that the omitted information would have been useful and informative—not that it rendered statements in the Proxy misleading, *see id.* at *3–4.  This approach is incompatible with binding Second Circuit precedent, *see Resnik*, 303 F.3d at 154 ("Disclosure of an item of information is not required, however, simply because it may be relevant or of interest to a reasonable investor.").[2]  Further, to the extent that the Court in *First Connecticut Bancorp* found that a plaintiff satisfies the requirement that he "specify *each statement* alleged to have been misleading" by alleging that the omission of cash flow projections or other information made *entire sections* of the proxy (such as the "summary of the financial advisor's Discounted Cash Flow Analysis on pages 55–56 of the Proxy," 2019 WL 4643799, at *4) misleading, I cannot agree that such a finding is faithful to the plain language of the PSLRA.  *See In Re 2007 Novastar Financial Inc., Sec. Lit.*, 579 F.3d at 882–83 & n.3, *supra*.

The Plaintiff also cites *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016), but that case does not help him either.  There, the Circuit noted that "[t]he rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation, according to which a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." *Id.* at 240 (internal quotation marks and citations omitted).  But in this case, the Plaintiff does not allege that any portion of the Proxy Statement contained only favorable information while omitting unfavorable information.  He alleges only that the Proxy statement did not sufficiently elaborate on the statements it made, for example, by failing to include some

---

[2] The District Court's suggestion in *St. Louis Police Retirement System v. Severson* that "[s]hareholders are entitled to a candid disclosure of all material facts . . . ," 2012 WL 5270125 (N.D. Cal. Oct. 23, 2012), is likewise inconsistent with the Second Circuit precedent.

of the assumptions underlying KBW's DCF analysis.  He does not allege that the missing

information was favorable or unfavorable; nor does he allege, except in conclusory fashion (Am.

Compl. ¶ 101), how the disclosure of the omitted information would have changed the overall

picture of the transaction presented by the Proxy, *i.e.*, whether it would have made that picture

more or less rosy, let alone how the omission of the information rendered any particular

statement in the Proxy misleading.  There is simply no non-conclusory allegation that any of

these omissions rendered any statements in the Proxy "half-truths," or "statements that are

misleading by omission," *id.* at 240.

Similarly, in *Republic Technology Fund, Inc. v. Lionel Corp.*, also cited by the Plaintiff,

the Second Circuit held that an omission violated Rule 10b-5, which contains language similar to

Rule 14a-9, because the company had disclosed an optimistic valuation of one of its subsidiaries

without mentioning a substantial loss the subsidiary had recently incurred.  483 F.2d 540, 546

(2d Cir. 1973).  The Circuit explained that "the voters on the merger were being shown the

frosting on the cake with no allusion in the statements to the fact that a substantial part of the

cake itself was dried out, if not mildewed."  *Id.*  By contrast, here there is no plausible allegation

that the Defendants selectively disclosed only favorable information.

In short, the Plaintiff has failed to plausibly allege that any of the omissions he cites in

the Amended Complaint rendered statements in the Proxy misleading, as required to state a

claim under Rule 14a-9.

## B.     The Section 20(a) Claim

Defendant argues—and the Plaintiff does not contest, *see* ECF No. 57 at 38—that absent

a violation of Section 14(a), the Plaintiff cannot state a claim under Section 20(a) of the

Exchange Act, 15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability

[under Section 20(a)], a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Because I have found that the Plaintiff has failed to plead a primary violation under Section 14(a), I must also conclude that the Plaintiff has failed to plead a claim under Section 20(a).

## C.     The State Law Claims

In the Amended Complaint, Plaintiff states that this Court has supplemental jurisdiction over his state law claims. Am. Compl. ¶ 9. Having dismissed the Plaintiff's federal claims, I decline to exercise supplemental jurisdiction over the state law claims. A district court may decline to exercise jurisdiction over state claims if, among other circumstances, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). In "'the usual case in which all federal-law claims are eliminated before trial' . . . 'the balance of factors to be considered . . . judicial economy, convenience, fairness, and comity . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 119 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cahill*, 484 U.S. 343, 350 n.7 (1988)). I see no reason to depart from this practice here, particularly in light of the fact that the Plaintiff's state-law claims appear to implicate novel issues of Maryland law. *See* ECF No. 61 at 2-3 (indicating that Maryland courts have not decided the potentially dispositive issue of whether standing to bring derivative claims on behalf of an acquired company is lost upon the consummation of a merger; 28 U.S.C. § 1367(c)(1) (whether a claim "raises a novel or complex issue of State law" is a factor that may lead a district court to decline to exercise supplemental jurisdiction over a claim).

**V.**      **CONCLUSION**

For the reasons stated above, the Defendants' motion to dismiss the Section 14(a) and Section 20(a) claims is GRANTED.  These claims are dismissed with prejudice.  I decline to exercise supplemental jurisdiction over the remaining state law claims.  The Plaintiff's breach of fiduciary duty and unjust enrichment claims are therefore dismissed without prejudice.

IT IS SO ORDERED.

                                                              _____/s/_____

                                                              Michael P. Shea, U.S.D.J.

Dated:            Hartford, Connecticut
                    April 16, 2020